OPINION OF THE COURT
Shirley Werner Kornreich, J.
Defendants Ogden CAP Properties, LLC, Sold Management, LLC, Sol Goldman Investments, LLC, 145 East 16th Street, LLC, and Tres Realty, LLC move for summary judgment pursuant to CPLR 3212. Plaintiffs Briana Adler, Lauren Shoenfeld,[1] and Perri Steiner cross-move to file an amended complaint. The motion and cross motion are granted in part and denied in part for the reasons that follow:
I. Factual Background and Procedural History
This is a putative bilateral class action. Plaintiffs seek to represent a class of all renters in the State of New York against a defendant class of all landlords in the State of New York to obtain rent rebates for violations of the warranty of habitability caused by Superstorm Sandy (the Storm). Issues exist regarding the suitability of the class representatives, due process, and a host of other serious problems. To be sure, many of these questions will ultimately be adjudicated in a class certification motion. Yet, given the myriad of unprecedented issues — both factual and legal — and the enormous cost of discovery, the court stayed discovery pending the resolution of this motion.[2] Indeed, the stakes are quite significant as so many people’s lives have been devastated by the Storm. Thus, it is imperative that the proposed vehicle for partially remedying such destruction is carried out in a way that is legally cognizable, capable of being managed by the court, and in full comport with the due process rights of both plaintiffs and defendants.
A. The Storm
On October 29, 2012, the Storm hit New York, causing devastation to millions. The fallout, however, was felt by some *616 more than others. While some people had to deal with the mere inconvenience of a nonoperational subway, many suffered immense losses, including their homes. To date, countless people are still picking up the pieces.
Though the aftermath of the Storm has been difficult, for many, surviving the Storm was a challenge. The experience of getting through the Storm turned on a multitude of factors, such as the fortune of being in a less-impacted location or in a building whose landlord helped mitigate the circumstances. The availability of electricity, heat, food, and other essentials also varied widely throughout Manhattan and other parts of the state, which were impacted differently. The range of experiences is unsurprising given that New York State has rental residences running the gamut from the zenith of luxury to the barely habitable. New York also has a diverse set of landlords, which includes those who merely rent portions of their homes and some of the world’s wealthiest real estate magnates. Nonetheless, as discussed in detail in Part II A, the law in this state guarantees the habitability of all rental residences. Although many local laws and regulations vary and impact damages, landlords throughout the state have strict liability to ensure their tenants reside in livable conditions. The law requires landlords to rebate rent for days when conditions were not habitable due to the Storm. Such rebates are discounted by the value of landlords’ mitigation efforts. This much is not in dispute.
The question with which this court must grapple is how the vehicle of a class action can be used when so much of the damages sought — and damages are really all that is at issue — turn on fact specific inquiries based on myriad variables such as where each building is located, how badly it was affected by the Storm, what mitigation efforts were made by the landlord, the terms of each tenant’s lease, and so much more. But first, before there can be a class, there must be class representatives.
B. The Class Representatives
The first proposed class representative is Briana Adler. She lives in a 709-unit, 31-story, two-building luxury apartment complex, built in 1988, located at 155 East 31st Street in Manhattan (Windsor). The complaint states that Windsor is owned by Ogden. This is not the case. Ogden is Windsor’s managing agent. Windsor is actually owned by nonparty Mastic *617 Associates of New York LLC,[3] a fact stated in Adler’s lease.[4] On October 1, 2012, Adler entered into a lease with Mastic for apartment 8A in Windsor. Adler’s market-priced lease provides attorneys’ fees to the prevailing party in a landlord-tenant dispute.
In anticipation of the Storm, Con Edison shut off Windsor’s electricity at approximately 8:30 p.m. on October 29 and did not turn it back on until November 3 at approximately 2:00 a.m. During this time, there was no electricity in Adler’s apartment. However, Windsor has an emergency generator, which was turned on immediately after Con Edison turned off its electricity. The generator provided power to the elevators (so that Adler would not have to climb eight flights of stairs), lighting in the common areas, and water pumps (so that Adler could have running water in her faucets, toilets, and shower, and, by the afternoon of October 31, there was heat and hot water). Moreover, Windsor’s tenants were provided with a host of free services to make the situation as bearable as possible. Such complimentary services included: (1) breakfast, lunch, snacks, and bottled water; (2) glow sticks; (3) charging stations in the lobby and service areas so that tenants, such as Adler, could charge their cell phones, computers, and other electronic devices; and (4) building security to ensure that the only people on the premises during this perilous time period were the tenants and their guests. Adler seeks a rent abatement for the time period when her apartment was “uninhabitable . . . when [it] was without electricity, heat, hot water and/or elevator service.” Moreover, she claims her circumstances are typical of the average New York State renter who suffered through the Storm.
The second proposed class representative is Lauren Shoenfeld. She also lives in a luxury apartment building (Washington Irving House), a 19-story building, built in 1963, located at 145 East 16th Street in Manhattan. According to the complaint, Washington Irving House is owned by 145 East and Goldman and is managed by Solil. This also is inaccurate. 145 East is the owner; Goldman and Solil are managing agents. Shoenfeld’s *618 lease,[5] for apartment 11K, commenced on September 4, 2012. Shoenfeld, a college student, did not pay rent. Rent was paid by her parents and the parents of her roommates.[6] The unrebutted evidence demonstrates that Shoenfeld left Washington Irving House before the Storm, stayed nearby with friends and family, and returned after the Storm when conditions were back to normal.[7] Further, Shoenfeld happens to be the niece of plaintiffs’ cocounsel, Harold Hoffman. Hoffman’s son, Adam, posted the following on his Facebook page: “If you lost power during Hurricane Sandy you should not have paid rent in full. You can claim your rent back by joining this case. There are no fees or costs. If interested, call or email Harold Hoffman, Esq. for more details at [his phone number and email address].” (See aff of Adam Goldblatt, dated Mar. 20, 2013, ¶ 10 [Goldblatt aff].) Adam’s brother, Joshua, also sent an email to his friends:
“I am emailing to let you know that my dad is one of the lawyers for the plaintiffs in a Hurricane Sandy class action ... If any of you fall into the category of people who lost power during the Hurricane (in your NY State apartment) and still had to pay rent, you may be entitled to a rent rebate. There is also the potential for approximately a $5K bonus payment. I have included my father’s number and email address below-if you want to be a part of the class-action, feel free to email or call him. If you know of anyone else who may have lost power as well, feel free to forward the email or pass along the message.” (Goldblatt aff ¶ ll.)[8]
The third proposed class representative is Perri Steiner. In 2012, Steiner lived in an apartment in a five-story, 21-unit walk- *619 up, built in 1920, and located at 17 Stuyvesant Street in Manhattan (the Stuyvesant building). Tres owns the Stuyvesant building. Steiner’s lease, dated July 29, 2012, provides attorneys’ fees to the prevailing party in a landlord-tenant dispute. Con Edison shut off the Stuyvesant building’s electricity between October 29 at 9:00 p.m. and November 2 at 5:00 p.m. Though the Stuyvesant building did not have heat during this time, the temperatures were in the 50s (and sometimes dropped into the 40s at night). The tenants’ stoves and hot water, which were not dependant on Con Edison electricity, remained operational. The Stuyvesant building was visited daily by a manager to address the tenants’ concerns. Regardless, Steiner was not subject to these conditions. She left her apartment before the Storm and did not return until either November 3 or 4, when the Stuyvesant building’s electricity was restored. Steiner permanently vacated her apartment on January 31, 2013. Tres has asserted a counterclaim against Steiner for allegedly causing her apartment to be infested with bedbugs, which allegedly spread throughout the Stuyvesant building, and for the poor condition in which she left her apartment.
C. Procedural History
Plaintiffs commenced this action on January 25, 2013. The complaint states two causes of action: (1) breach of the warranty of habitability, and (2) unjust enrichment. After the parties conducted some class discovery, the court became involved when plaintiffs sought broad and expensive electronic discovery to which defendants objected. Defendants filed the instant motion for summary judgment on March 22, 2013, and the court stayed discovery.
II. Discussion
Summary judgment may be granted only when it is clear that no triable issue of fact exists. (Alvarez v Prospect Hosp., 68 NY2d 320, 325 [1986].) The burden is upon the moving party to make a prima facie showing of entitlement to summary judgment as a matter of law. (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067 [1979].) A failure to make such a prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers. (Ayotte v Gervasio, 81 NY2d 1062, 1063 [1993].) If a prima facie showing has been made, the burden shifts to the opposing party to produce evidence sufficient to establish the existence of material issues of *620 fact. CAlvarez, 68 NY2d at 324; Zuckerman, 49 NY2d at 562.) The papers submitted in support of and in opposition to a summary judgment motion are examined in the light most favorable to the party opposing the motion. (Martin v Briggs, 235 AD2d 192, 196 [1st Dept 1997].) Mere conclusions, unsubstantiated allegations, or expressions of hope are insufficient to defeat a summary judgment motion. {Zuckerman, 49 NY2d at 562.) Upon the completion of the court’s examination of all the documents submitted in connection with a summary judgment motion, the motion must be denied if there is any doubt as to the existence of a triable issue of fact. (Rotuba Extruders v Ceppos, 46 NY2d 223, 231 [1978].)
A. The Warranty of Habitability
New York’s warranty of habitability is codified in Real Property Law § 235-b, which provides:
“1. In every written or oral lease or rental agreement for residential premises the landlord or lessor shall be deemed to covenant and warrant that the premises so leased or rented and all areas used in connection therewith in common with other tenants or residents are fit for human habitation and for the uses reasonably intended by the parties and that the occupants of such premises shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety. When any such condition has been caused by the misconduct of the tenant or lessee or persons under his direction or control, it shall not constitute a breach of such covenants and warranties.
“2. Any agreement by a lessee or tenant of a dwelling waiving or modifying his rights as set forth in this section shall be void as contrary to public policy.
“3. In determining the amount of damages sustained by a tenant as a result of a breach of the warranty set forth in the section, the court;
“(a) need not require any expert testimony; and “(b) shall, to the extent the warranty is breached or cannot be cured by reason of a strike or other labor dispute which is not caused primarily by the individual landlord or lessor and such damages are attributable to such strike, exclude recovery to such extent, except to the extent of the net savings, if any, to the landlord or lessor by reason of such strike or labor dispute allocable to the tenant’s premises, *621 provided, however, that the landlord or lesser has made a good faith attempt, where practicable, to cure the breach.
“(c) where the premises is subject to regulation pursuant to the local emergency housing rent control law, the emergency tenant protection act of nineteen seventy-four, the rent stabilization law of nineteen hundred sixty-nine or the city rent and rehabilitation law, reduce the amount awarded hereunder by the total amount of any rent reduction ordered by the state division of housing and community renewal pursuant to such laws or act, awarded to the tenant, from the effective date of such rent reduction order, that relates to one or more matters for which relief is awarded hereunder.”
“[Real Property Law § 235-b] was designed to give rise to an implied promise on the part of the landlord that both the demised premises and the areas within the landlord’s control are fit for human occupation at the inception of the tenancy and that they will remain so throughout the lease term.” CPark W. Mgt. Corp. v Mitchell, 47 NY2d 316, 327 [1979].)
“[T]he statute places an unqualified obligation on the landlord to keep the premises habitable.” (Id.) “The obligation of the tenant to pay rent is dependent upon the landlord’s satisfactory maintenance of the premises in habitable condition.” (Id.) Here, the fact that the Storm caused the subject habitability issues is not relevant since a landlord’s obligations under Real Property Law § 235-b are unqualified.
That being said, in Park W., the seminal Court of Appeals case on the warranty of habitability, the Court’s discussion of how damages are to be computed impacts the viability of the instant proposed class action since damages are the only issue. The Court explained:
“Naturally, it is a patent impossibility to attempt to document every instance in which the warranty of habitability could be breached. Each case must, of course, turn on its own peculiar facts . . .
“Problematical in these cases is the method of ascertaining damages occasioned by the landlord’s breach . . . Inasmuch as the duty of the tenant to pay rent is coextensive with the landlord’s duty to maintain the premises in habitable condition, the *622 proper measure of damages for breach of the warranty is the difference between the fair market value of the premises if they had been as warranted, as measured by the rent reserved under the lease, and the value of the premises during the period of the breach. The award may take the form of a sum of money awarded the tenant in a plenary action or a percentage reduction of the contracted-for rent as a setoff in summary nonpayment proceeding . . .
“In ascertaining damages, the finder of fact must weigh the severity of the violation and duration of the conditions giving rise to the breach as well as the effectiveness of steps taken by the landlord to abate those conditions.” (Id. at 327-329 [emphasis added and citations omitted].)
As set forth above, section 235-b only applies to the parties to the lease. Although the warranty of habitability applies to all leases (including oral leases), this warranty, like all warranties, is merely part of the contract itself. (170 W. 85th St. Hous. Dev. Fund Corp. v Marks, 40 Misc 3d 1237[A], 2013 NY Slip Op 51332[U], *5 [Civ Ct, NY County 2013] [“As the warranty of habitability sounds in breach of contract ... (a nonparty) does not have standing to seek an abatement predicated on the breach of the warranty of habitability”].) Ergo, the warranty of habitability does not bind nonparties, such as the landlord’s agents. Plaintiffs argue that certain cases suggest that the word “landlord” in section 235-b must be read broadly to include all those with a nexus to the lease, such as managing agents. However, the cases cited by plaintiffs concern public administrators (governed by RPAPL art 7-A), not private third-party management companies. (See e.g. Department of Hous. Preserv. & Dev. of City of N.Y. v Sartor, 109 AD2d 665 [1st Dept 1985].) Of course, owning the leased premises is not a prerequisite to being a “landlord” for the purposes of section 235-b (e.g. sublessors are equally obligated to keep the premises habitable), but being a contracting party is. Where, as here, the managing agent defendants are not parties to plaintiffs’ leases, they are not liable for monetary damages for breaches of the warranty of habitability. A breach of such warranty is a mere breach of contract, requiring privity. The section 235-b claim, therefore, is dismissed as against the non-landlord defendants: Ogden, Solil, and Goldman. Similarly, plaintiffs cannot amend to assert a claim against Matel Realty, LLC, or any other managing agent.
*623 Additionally, the court dismisses plaintiffs’ unjust enrichment claim. The warranty of habitability arises from the subject leases — which are written contracts — and, hence, cannot give rise to the quasi contract, unjust enrichment cause of action. (Goldman v Metropolitan Life Ins. Co., 5 NY3d 561 [2005]; accord Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 388 [1987].) The claim also would fail against the managing agent defendants because it seeks to improperly impose contractual liability onto third parties. The subject rent is the property of the landlords, not the managing agents, and can only be recouped from the former. Absent veil piercing allegations, there is no basis to maintain a claim against the managing agent defendants.
Next, defendants argue that the warranty of habitability only applies to tenants who actually lived in their apartments during the period of uninhabitability. (See Leventritt v 520 E. 86th St., 266 AD2d 45, 45-46 [1st Dept 1999] [“plaintiff (is not) entitled to compensation for defendant’s breach of the warranty of habitability during a period in which plaintiff did not live in the apartment” (citing Halkedis v Two E. End Ave. Apt. Corp., 161 AD2d 281, 282 [1st Dept 1990])]; York Towers, Inc. v Kotick, 2012 NY Slip Op 30648[U], *18 [Sup Ct, NY County 2012] [“In regard to the warranty of habitability, a lessee can obtain an abatement for the period of time he or she resided in the apartment” (emphasis added)]; Marks, 40 Misc 3d 1237[A], 2013 NY Slip Op 51332[U], *5 [“(respondent’s) failure to reside in the subject premises also operates to deprive her of a remedy pursuant to a breach of the warranty of habitability”].)
The unrebutted evidence shows that two of the proposed class representatives, Shoenfeld and Steiner, left their apartments, as so many people do before a hurricane, to stay with family and friends in a safer area. They returned after the Storm, when everything was back to normal. They did not suffer any loss by residing in an apartment lacking essential services. As defendants concede, if a tenant left during or after the Storm due to uninhabitable conditions, the inquiry might be different.[9] However, no evidence was presented demonstrating that Shoenfeld and Steiner left because of uninhabitable condi *624 tions caused by the Storm. Rather, the evidence on this summary judgment motion proves they left because they did not want to be in their apartments during the Storm. A rent rebate would be a windfall, not compensation for lacking a habitable residence. The warranty of habitability is not applicable to such a situation.
In other words, without a loss, there is no claim, because the warranty of habitability’s purpose is to compensate people for living in an uninhabitable residence. (See Park W; Curry v New York City Hous. Auth., 77 AD2d 534, 536 [1st Dept 1980] [courts adopted commercial law principles in developing law of warranty of habitability].) It incentivizes landlords to keep apartments livable and to make prompt mitigation efforts to remedy issues that arise. Landlords know that if they do not comply, they will not get paid. In contrast, where, as here, a tenant chose not to be in her apartment and never felt any detrimental habitability impacts, the tenant cannot maintain a warranty of habitability claim. This is the case with Shoenfeld and Steiner. They are not typical of the proposed class since, unlike those that suffered through harsh conditions during and after the Storm, they were somewhere else. They have no section 235-b claim and therefore cannot be class representatives.[10] (See Raske v Next Mgt., LLC, 40 Misc 3d 1240[A], 2013 NY Slip Op 51514[U], *8 [Sup Ct, NY County 2013], quoting Murray v Empire Ins. Co., 175 AD2d 693, 695 [1st Dept 1991] [“(t)he procedural device of a class action may not be used to bootstrap a plaintiff into standing which is otherwise lacking”].)
B. Class Issues
Turning now to class issues, it is well established that the determination of “whether a lawsuit qualifies as a class action . . . [']rests within the sound discretion of the trial court.’ ” (City of New York v Maul, 14 NY3d 499, 509 [2010], quoting *625 Small v Lorillard Tobacco Co., 94 NY2d 43, 52 [1999].) Pursuant to CPLR 901 (a), “five prerequisites must be satisfied before class action status can be granted.” (Tegnazian v Consolidated Edison, 189 Misc 2d 152, 154 [Sup Ct, NY County 2000].) They are:
“1. the class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;
“2. there are questions of law or fact common to the class which predominate over any questions affecting only individual members;
“3. the claims or defenses of the representative parties are typical of the claims or defenses of the class;
“4. the representative parties will fairly and adequately protect the interests of the class; and
“5. a class action is superior to other available methods for the fair and efficient adjudication of the controversy.”
Since this is not a class certification motion, the court will not address each factor in detail. However, the purpose of the instant motion is to dispose of proposed classes which are so legally defective on their faces as to not even merit class discovery. (See Downing v First Lenox Terrace Assoc., 107 AD3d 86, 91 [1st Dept 2013] [dismissal warranted where “it appears conclusively from the complaint and from the affidavits that there was as a matter of law no basis for class action relief” (quoting Wojciechowski v Republic Steel Corp., 67 AD2d 830, 831 [4th Dept 1979])].)[11] Such defective classes include improper parties to a section 235-b claim (discussed earlier) and classes which are patently impractical or violate due process (discussed below).
1, The Plaintiff Class
Defendants argue that any plaintiff class is inappropriate since damages can only be determined based on both the specific conditions in each affected apartment and the specific mitigation efforts by each landlord. To wit, as discussed in Part I, the *626 mitigation in Windsor was vastly superior to the mitigation in Washington Irving House and the conditions in all three of the relevant buildings varied drastically.[12] Moreover, the damages each landlord in New York State is subject to turns on his mitigation efforts for each apartment in each building owned. Inquiries do not get more fact specific than this. Though plaintiffs correctly aver that certain factors, such as electricity outages, can be determined on a class-wide basis because they can be gleaned from publicly available data (i.e., Con Edison’s records), there is simply no way to make class-wide determinations about landlords’ mitigation efforts or the effects of the outages in each area or, for that matter, each building (e.g. those with generators, without elevators, or using natural gas or oil for hot water or heat).[13] (See Solomon v Bell Atl. Corp., 9 AD3d 49, 54-55 [1st Dept 2004] [class action not viable where “(i)ndividual trials also would be required to determine damages based on the extent of each plaintiffs injuries”], citing Tegnazian, 189 Misc 2d at 155 [“(T)he damages of each putative class member are not easily computable. It would require considerable inquiry regarding not only the amount, but whether the damage was caused by the blackout”].)
The smallest possible class — a class comprised of tenants in a single building — may be no more viable than any other possible class (i.e., a class defined by block, neighborhood, or borough) because, even in the same building, mitigation may have varied apartment-by-apartment (e.g. ground floor apartments had flooding, but no elevator concerns). Moreover, damages (including legal costs governed by a prevailing party clause) may vary depending upon whether the tenant has a rent regulated or market lease, or even no lease at all. Computing damages in any way other than tenant-by-tenant runs the risk of glossing over the needs of each tenant and the individual efforts of each *627 landlord. If landlords in buildings such as Windsor were lumped into a class with landlords who either made fewer or no mitigation efforts, Windsor’s landlord would be subsidizing other landlords’ failure to mitigate. Consequently, at most, the court will consider a plaintiff class limited to specific buildings where it can be demonstrated that the tenants of such buildings endured similar conditions and received similar mitigation.
2. The Defendant Class
There cannot be a defendant class in this case for two reasons: (1) a defendant class would violate due process; and (2) the fact specific nature of determining each landlord’s mitigation efforts is not compatible with the commonality and numerosity factors.
“The Due Process Clause ‘protects individual liberty against “certain government actions regardless of the fairness of the procedures used to implement them.” ’ ” (State of New York v Myers, 22 Misc 3d 809, 819 [Sup Ct, Albany County 2008], quoting Collins v Harker Heights, 503 US 115, 125 [1992].) “In the class action context, due process insures procedural fairness and protects the interests of absent class members.” (Bakalar v Vavra, 237 FRD 59, 63 [SD NY 2006], citing Hansberry v Lee, 311 US 32, 42 [1940].) “These concerns are particularly acute in defendant class actions where the unnamed class members risk exposure to liability.” (Id., citing In re Integra Realty Resources, Inc., 262 F3d 1089, 1105 [10th Cir 2001]; Marchwinski v Oliver Tyrone Corp., 81 FRD 487, 489 [WD Pa 1979] [“(A) defendant class differs in vital respects from a plaintiff class, and . . . raises immediate due process concerns. . . . (W)hen one is an unnamed member of a defendant class, one may be required to pay a judgment without having had the opportunity to personally defend the suit”].)
“Accordingly, ‘[t]here is little doubt that a defendant class requires closer scrutiny ... to assure fairness to absent members based on long-standing due process protections.’ ” (Bakalar, 237 FRD at 64, quoting 2 Newberg on Class Actions § 4:48 [4th ed 2002].) “As a result, defendant class actions are seldom certified.” (Id. [collecting cases].) Indeed, “[t]here is great judicial reluctance to certify a defendant class when the action is brought by a plaintiff class. The primary concern with bilateral actions ... is a fear that each plaintiff member has not been injured by each defendant member.” (Thillens, Inc. v Community Currency Exch. Assn, of Illinois, Inc., 97 FRD 668, *628 675 [ND Ill 1983] [collecting cases];[14] see also Ameritech Benefit Plan Comm, v Communication Workers of Am., 220 F3d 814, 820 [7th Cir 2000] [“Defendant classes, initiated by those opposed to the interests of the class, are more likely than plaintiff classes to include members whose interests diverge from those of the named representatives, which means they are more in need of . . . due process protections”].) Here, the prospect of providing all New York landlords with notice that comports with due process is a daunting task, if at all possible. In fact, the effort required to make sure each landlord has adequate notice might be tantamount to the effort of effectuating service in a Housing Court case. Except, in a class action, the individual tenants’ recovery is lower (due to the costs of litigating such a complex class action) and the likelihood of massive due process violations is severe.[15] Additionally, for the reasons discussed earlier, computing damages in a section 235-b case is simply too fact specific to be amenable to a defendant class. Finally, the impracticability of managing such a class is exemplified by the Herculean task of enforcing judgments against and collecting damages from every landlord in the state.
To be sure, a major benefit of having a defendant class is avoiding relitigating the same threshold issue, especially when there is a risk of inconsistent rulings. Here, however, the threshold issue of landlords’ section 235-b liability is uncontroverted. The gravamen of this case is how much each landlord must pay to each tenant, an inquiry requiring building-by-building, and perhaps tenant-by-tenant, discovery. This arduous task cannot be eschewed, gutting the efficiency of utilizing a class action.
*629 For these reasons, the viability of this case as a bilateral class action is gravely in doubt. Although it may be possible to name a discreet group of landlords and find appropriate building representatives to serve as plaintiffs, the only way to expeditiously accomplish the original desired goal of recouping compensation for all Storm-related, warranty of habitability claims is to utilize the capable services of Housing Court. It is well known that New York’s residential tenants are provided significant statutory protections from landlord abuse and this City’s Housing Court is duly equipped to mete out justice to pro se tenants who come forward with meritorious claims. This proposed class action, on the other hand, presents the trade-off of supposed litigation efficiency for logistical and due process conundrums. The forthcoming class certification motion will afford plaintiffs an opportunity to address the concerns raised in this decision. However, plaintiffs should not expect certification absent concrete, specific, and practical solutions to such concerns, especially when victims of the Storm may have superior means to obtain compensation. Accordingly, it is ordered that the motion for summary judgment by defendants Ogden CAP Properties, LLC, Sold Management, LLC, Sol Goldman Investments, LLC, 145 East 16th Street, LLC, and Tres Realty, LLC is granted in part as follows: (1) the unjust enrichment claim is dismissed; (2) the claims against non-landlord defendants (Ogden, Solil, and Goldman) are dismissed; (3) the claims of plaintiffs Lauren Shoenfeld and Perri Steiner are dismissed; (4) Tres’ counterclaim against Steiner is dismissed without prejudice with leave to refile in Housing Court; and (5) plaintiff Briana Adler may not seek certification of a class in contravention of this decision (i.e., no statewide class, no defendant class, etc.); and it is further ordered that plaintiffs’ cross motion to amend is granted, without opposition, as to the addition of Mastic Associates of New York LLC (since it owns Windsor), but denied as to Matel Realty, LLC; and it is further ordered that plaintiff Briana Adler’s complaint is dismissed with leave to file an amended complaint in accordance with this decision and with a new caption, within 20 days of the entry of this order on the New York State Courts Electronic Filing (NYSCEF) system; and it is further ordered that the parties are to appear in Part 54, Supreme Court, New York County, 60 Centre Street, Room 228, New York, NY, for a status conference on January 23, 2014 at 11:00 in the forenoon, at which time a *630 briefing schedule for class certification will be set and a determination will be made about how much, if any, class discovery is needed beforehand.

. Shoenfeld’s name is misspelled in the complaint.

. Since this is a summary judgment motion, the court only relies on undisputed facts, except when the evidence clearly resolves a contested fact (e.g. the owner of Windsor, discussed below).

. Mastic is one of two defendants that plaintiffs seek to add in their proposed amended complaint. Defendants do not object to naming Mastic as a defendant.

. Adler knew that her lease was with Mastic, and not Ogden, since her lease states that it is between “[Ogden] as agent for [Mastic].”

. Unlike the leases of Adler and Steiner, Shoenfeld’s lease does not contain an attorneys’ fees provision. However, other tenants in Washington Irving House have leases with attorneys’ fees provisions. That some tenants have such a provision in their leases and others do not is an issue that must be addressed in the class certification motion, as will the fact that some leases contain a jury waiver while other leases do not, and some leases may be rent regulated while others are not.

. This does not matter. However, the court does not provide a detailed discussion about why a tenant need not be the one to pay rent because, as discussed in Part II, Shoenfeld’s claim fails for other reasons.

. It appears that Shoenfeld had no interest in returning to her apartment until her college classes resumed, well after services in her apartment were fully restored.

. By coincidence, Goldblatt is an employee of Solil. His sister-in-law was one of Shoenfeld’s roommates. Also, Goldblatt and Adam were college roommates and friends both in real life and on Facebook. This is why Goldblatt saw Adam’s post and received Joshua’s email.

. Plaintiffs cannot maintain a claim for constructive eviction since such claim requires “wrongful acts by the landlord.” (Pacific Coast Silks, LLC v 247 Realty, LLC, 76 AD3d 167, 172 [1st Dept 2010].) Here, the issues were caused by the Storm, not landlords. Then too, plaintiffs left their belongings *624 in the apartments. (See Barash v Pennsylvania Term. Real Estate Corp., 26 NY2d 77, 83 [1970] [“The tenant, however, must abandon possession in order to claim that there was a constructive eviction”].)

. As Shoenfeld’s claims are dismissed, the court need not reach the ethical issues surrounding Hoffman, raised by the email and Facebook post discussed in Part I. Also, as Steiner’s claims are dismissed, Tres’ counterclaim regarding the bedbug infestation is dismissed without prejudice with leave to refile in Housing Court, where such claim belongs. Indeed, if Adler, or any other tenant, is really interested in getting a rent rebate for issues related to the Storm, she will surely get her money much sooner in a Housing Court proceeding than a class action, which could take years to adjudicate. Moreover, New York tenants routinely appear pro se in Housing Court, which is eminently capable of handling section 235-b claims.

. Plaintiffs take issue with consideration of this motion before the completion of class discovery. As a result, rather than substantively rebut defendants’ legal arguments, plaintiffs’ briefs argue the impropriety of this motion and cite merely to general propositions regarding class certification. Although plaintiffs will have one final opportunity to save their class action from dismissal on the class certification motion, that motion may not be used to relitigate the issues decided herein, where, as here, plaintiffs chose not to present relevant argument.

. In fact, the quality of the mitigation in Windsor may very well preclude a finding that the conditions in Windsor were typical of the average Storm-impacted apartment.

. It should be noted that conditions in certain areas of New York City (i.e., Brooklyn, Queens, Staten Island) were not back to normal until long after the first week of November 2012 (when conditions in the three subject buildings were resolved). The aftermath for those outside Manhattan was prolonged beyond the handful of days that the named plaintiffs were impacted. In no event can the plaintiff class include tenants outside of Manhattan (as conditions varied greatly by county) or in other parts of New York State (where conditions varied even more, and local landlord-tenant laws differ).

. “(1) A defendant class will not be certified unless each named plaintiff has a colorable claim against each defendant class member; (2) A defendant class will not be certified . . . without a clear showing that common questions do in fact predominate over individual issues; (3) The requirement that each named plaintiff must have a claim against each defendant may be waived where the defendant members are related by a conspiracy or ‘juridical link.’ ” (Thillens, 97 FRD at 675-676.)
These requirements are not met in this case. In any event, for the multitude of reasons discussed herein, this case cannot be maintained as a bilateral class action.

. It should be noted that many landlords and tenants may not wish to use the legal system to address Storm-related claims. Rather, as is surely the case in many instances, landlords and tenants have worked out their own settlements, such as voluntary rebates or factoring in Storm-issues into lease renewal negotiations. The class opt-out process would raise a host of issues, especially if such settlements were not done with legal formality.